**TYCKO & ZAVAREEI LLP**
Hassan A. Zavareei (State Bar No. 181547)
1828 L Street, N.W., Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
E-Mail: hzavareei@tzlegal.com

**TYCKO & ZAVAREEI LLP**
Annick M. Persinger (State Bar No. 272996)
Tanya S. Koshy (State Bar No. 277095)
The Tower Building
1970 Broadway – Suite 1070
Oakland, CA 94612
Telephone: (510) 254-6808
Facsimile: (510) 210-0571
E-Mail: apersinger@tzlegal.com
E-Mail: tkoshy@tzlegal.com

*Counsel for Plaintiff and the Proposed Class*
*(Additional Counsel on Signature Page)*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUSIE REXROAD, DEONTE WITCHER, EDUARDO SILVERA, CLAUDIA GALINDO, GUAN PERRY, MELISSA GURTLER, and JULIE ESQUEDA, individually and on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>HYUNDAI MOTORS CORPORATION, HYUNDAI MOTORS AMERICA, KIA MOTORS CORPORATION, and KIA MOTORS AMERICA, INC.,<br><br>Defendants. | Case No. 4:19-cv-01461<br><br>(JURY TRIAL DEMANDED)<br><br>**CLASS ACTION COMPLAINT** |

1    Plaintiffs Susie Rexroad ("Plaintiff Rexroad" or "Ms. Rexroad"), Deonte Witcher ("Plaintiff

2  Witcher" or "Mr. Witcher"), Eduardo Silvera ("Plaintiff Silvera" or Mr. Silvera"), Claudia Galindo

3  ("Plaintiff Galindo" or Ms. Galindo"), Guan Perry ("Plaintiff Perry" or "Mr. Perry"), Melissa Gurtler

4  ("Plaintiff Gurtler" or "Ms. Gurtler"), and Julie Esqueda ("Plaintiff Esqueda" or "Ms. Esqueda") on

5  behalf of themselves and all others similarly situated, bring this Class Action Complaint against

6  Defendants Hyundai Motor Company ("HMC") and Hyundai Motor America ("HMA") (collectively

7  "Hyundai"), as well as Kia Motors Corporation ("KMC") and Kia Motors America, Inc. ("KMA")

8  (collectively, "Kia"). Plaintiffs, by their attorneys, make the following allegations pursuant to the

9  investigation of their counsel and based upon information and belief, except as to allegations specifically

10  pertaining to themselves and their counsel, which are based on personal knowledge.

11                                    **INTRODUCTION**

12    1.    Certain Hyundai and Kia vehicles ("Class Vehicles") contain an engine defect ("Engine

13  Defect") that can cause the vehicles to spontaneously catch fire with drivers and passengers barely

14  escaping to safety.

15    2.    Specifically, a design/and or manufacturing defect in Class Vehicles' gasoline direct

16  injection ("GDI") engines restricts oil flow to the engines' parts, such as the connecting rod bearings,

17  causing those parts to wear out prematurely and seize. Not only can engine seizure cause engine failure,

18  it can cause engine parts to break off and knock holes into the engine, leaking fluids and igniting a fire.[1]

19    3.    As a result of the Engine Defect, Class Members, as well as passengers, other drivers, and

20  bystanders, are exposed to an unreasonable risk of accident, injury, or death should their vehicles engulf

21  into flames or result in engine failure.

22    4.    Hyundai and Kia know of this Engine Defect and the safety risk it poses to consumers.

23

24

25

26  _____

27  [1] Upon information and belief, the Class Vehicles include the following but are not limited to: Model Year ("MY") 2011-2019 Hyundai Sonata; 2013-2019 Hyundai Santa Fe and Santa Fe Sport, 2011-2019 Kia Optimas, MY 2011-2019 Kia Sorentos, MY 2011-2019 Kia Sportages, and MY 2010-2019 Kia

28  Souls. Plaintiffs reserve the right to amend or add to the vehicle models and model years included in the definition of Class Vehicles after conducting discovery.

5.    But Hyundai and Kia also advertise on their websites that they conduct extensive testing. Moreover, Hyundai and Kia share the same testing facility in California City, California. Hyundai and Kia's joint testing should have alerted them to the defect in their GDI engines.

6.    Moreover, since 2010 through mid-2018, the National Highway Traffic Safety Administration (NHTSA) received over a hundred complaints describing non-collision fires in Class Vehicles, and over two hundred complaints describing potential fire indicators, such as melted wires and smoke, in Class Vehicles.[2]

7.    Based on these complaints, the Center for Auto Safety, the preeminent automotive safety advocacy non-profit founded by Ralph Nader, petitioned the NHTSA in June 2018 to investigate the complaints of spontaneous fires.[3] In October 2018, the Center further called on Hyundai and Kia to recall millions of cars, including all MY 2011-2014 Kia Sorentos, Kia Optimas, Hyundai Sonatas, and Hyundai Santa Fes, and MY 2010-2015 Kia Souls.[4]

8.    But despite their knowledge of the Engine Defect, Hyundai and Kia have only issued limited recalls and technical service bulletins to technicians, not to the public at large. None of these affirmative steps reveal the existence of the Engine Defect that renders their engines prone to failure and non-collision fires.

9.    And, in fact, Hyundai and Kia's prior recalls in 2015 and 2017 appear to have only *increased* the safety risk to Class Members who had their Class Vehicles serviced under those recalls. Just months ago, in mid-January 2019, Hyundai and Kia issued recalls of thousands of vehicles that received an engine replacement as part of prior recalls. Kia admits that, in replacing engines as part of those prior recall, a "high-pressure fuel pipe may have been damaged, misaligned or improperly torqued . . . allowing fuel to

---

[2] *See* Jason Levine, Petition for Defect Investigation, Center for Auto Safety (Jun.11, 2018), https://www.autosafety.org/wp-content/uploads/2018/06/Center-for-Auto-Safety-Kia-Hyundai-Fire-Defect-Petition.pdf (last visited Mar. 19, 2019).
[3] *Id.*
[4] *Center for Auto Safety Demands Recall of 2.9 Million 2011-2014 Kia and Hyundai Vehicles After Almost One Non-Collision Fire Report Every Day for Four Months*, Center for Auto Safety, (Oct. 12, 2018), https://www.autosafety.org/center-for-auto-safety-demands-recall-of-2-9-million-2011-2014-kia-and-hyundai-vehicles-after-almost-one-non-collision-fire-report-every-day-for-four-months/ (last visited Mar. 19, 2019).

leak increasing the risk of fire."[5] Hyundai states only that "out of an abundance of caution [it] has issued a follow-on recall to inspect and confirm proper reinstallation of the fuel tube to the high-pressure fuel pump. While Hyundai is not aware of any fires caused by this issue, nothing is more important than the safety and security of Hyundai customers."[6]

10.     But once again, even in these recent recalls, Hyundai and Kia conceal the existence of the Engine Defect, the safety risks to consumers, and the documented non-collision fires and potential non-collision fires that result from the Engine Defect.

11.     In short, despite notice and knowledge of the Engine Defect from numerous complaints and its own internal records, including durability testing, Hyundai and Kia have neither (1) issued a widespread recall of all Class Vehicles to repair the Engine Defect, (2) offered its customers suitable repairs or replacements free of charge, nor (3) offered to reimburse its customers who have incurred out-of-pocket expenses to repair the Engine Defect.

12.     Not only do Hyundai and Kia actively conceal the Engine Defect in Class Vehicles' engines and the safety risks described herein, they have not revealed that the existence of the Engine Defect would diminish the intrinsic and resale value of the Class Vehicles.

13.     As a result of Hyundai and Kia's unfair, misleading, deceptive, and/or fraudulent business practices, in failing to disclose the Engine Defect to Plaintiffs and putative class members, Plaintiffs and the Class Members have suffered injury in fact, incurred damages, and have otherwise been harmed by Defendants' conduct.

14.     Specifically, Plaintiffs have had to expend substantial money and time attempting to repair the Engine Defect. Moreover, had Plaintiffs and the putative class members known of the Engine Defect, they would not have purchased or leased those vehicles, or would have paid substantially less for them. Moreover, because of the Engine Defect, the class members' vehicles have a lower market value, and are inherently worth less than they would be.

---

[5] Statement on 2019 Recall, Kia (Jan. 11, 2019), http://mediaassets.abcactionnews.com/document/2019/Kia%20recall%20statement.pdf (last visited Mar. 19, 2019).
[6] Hyundai Engine Recall Information, Hyundai, https://hyundaiengineinfo.com/ (last visited Mar. 19, 2019).

15.     Plaintiffs bring this action to redress Hyundai and Kia's misconduct. Plaintiffs seek recovery of damages and/or a repair under state consumer protection statutes, breach of implied and express warranties, and reimbursement of all expenses associated with the repair or replacement of the Class Vehicles.

## THE PARTIES

16.     Susie Rexroad is a California citizen who resides in Livermore, California.

17.     Deonte Witcher is a North Carolina citizen who resides in Waxhaw, North Carolina.

18.     Eduardo Silvera is a California citizen who resides in Corona, California.

19.     Melissa Gurtler is an Arizona citizen who resides in Gilbert, Arizona.

20.     Julie Esqueda is a California citizen who resides in Compton, California.

21.     Claudia Galindo is a permanent resident of Nevada who resides in Las Vegas, Nevada.

22.     Guan Perry is a Michigan citizen who resides in Clinton Township, Michigan.

23.     HMC is a South Korean multinational automaker headquartered in Seoul, South Korea. HMC controls and operates not only HMA, but also KMC and KMA, all described below. HMC is in charge of the design, manufacturing, and testing of the engines in Class Vehicles.

24.     HMA is an automobile design, manufacturing, distribution, and/or service corporation doing business within the United States. HMA designs, develops, manufactures, distributes, markets, sells, leases, warrants, services, and repairs passenger vehicles, including the Hyundai Class Vehicles. HMA is incorporated and headquartered in the state of California with its principal place of business at 10550 Talbert Avenue, Fountain Valley, California 92708.

25.     KMC is a South Korean multinational automaker headquartered in Seoul, South Korea. KMC is the parent corporation of KMA.

26.     KMA is an automobile design, manufacturing, distribution, and/or service corporation doing business within the United States. Furthermore, Defendant KMA designs, develops, manufactures, distributes, markets, sells, leases, warrants, services, and repairs passenger vehicles, including the Kia Class Vehicles.

27.     KMA is incorporated and headquartered in the state of California with its principal place of business at 111 Peters Canyon Road, Irvine, California 92606. KMA is the U.S. sales and marketing

1  division, which oversees sales and other operations across the United States. KMA distributes Kia

2  vehicles and sells these vehicles through its network of more than 700 dealerships. Money received from

3  the purchase of a Kia vehicle from a dealership flows from the dealer to KMA.

4    28.    Defendants share testing facilities and equipment in California City, California, where

5  Defendants conduct pre-sale durability testing.[7]

6    29.    On information and belief, the design, manufacture, modification, installation, and

7  decisions regarding the GDI engines for the Class Vehicles were made exclusively by Defendants.

8    30.    Upon information and belief, the distribution, service, repair, installation, and decisions

9  regarding the GDI engines as it relates to the Engine Defect within the Class Vehicles were performed

10  exclusively by Defendants.

11    31.    Upon information and belief, Defendants developed the post-purchase owner's manuals,

12  warranty booklets, and information included in maintenance recommendations and/or schedules for the

13  Class Vehicles.

14                          **JURISDICTION AND VENUE**

15    32.    This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005

16  ("CAFA"), 28 U.S.C. §§1332(d)(2) and (6) because: (i) there are 100 or more class members, (ii) there is

17  an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs, and (iii) there

18  is minimal diversity because at least one plaintiff and one defendant are citizens of different states. This

19  Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

20    33.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants

21  transact substantial business in this district and are headquartered in this District. Defendants have

22  advertised in this district and have received substantial revenue and profits from sales and/or leases of

23  the Class Vehicles in this district; and have a manufacturing plant here, therefore, a substantial part of the

24  events and/or omissions giving rise to the claims occurred, in part, within this district.

25    34.    This Court has personal jurisdiction over the Defendants by virtue of them transacting

26  and doing business in this judicial district and because Defendant KMA is headquartered in California.

27  _____

28  [7] *Hyundai and Kia Celebrate Grand Opening of a New $60 Million California-Based Proving Ground*, Hyundai (Jan. 26, 2005), https://www.hyundainews.com/en-us/releases/380 (last visited Mar. 19, 2019).

Defendants have transacted and done business in the State of California and in this judicial district and have engaged in statutory violations in California and this judicial district.

## TOLLING OF STATUTES OF LIMITATIONS

35.    Any applicable statute(s) of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiffs and the members of the Class could not have reasonably discovered the true, latent nature of the Engine Defect until shortly before this class action litigation was commenced.

36.    Defendants were and remain under a continuing duty to disclose to Plaintiffs and the Members of the Class the true character, quality, and nature of the Class Vehicles, that the design and/or manufacturing Engine Defect will result in restricted oil flow, engine failure, and non-collision fires, that they will require costly repairs, pose safety concerns, and diminish the value of the Class Vehicles. As a result of the active concealment by Defendants, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## THE EXPERIENCES OF THE NAMED PLAINTFFS
### Deonte Witcher

37.    In October 2017, Plaintiff Witcher purchased a used 2012 Kia Optima from Crown Automotive (Asley Road location) in Charlotte, North Carolina ("Crown").  His car had approximately 60,000 miles, a clean car fax history report, and included a limited warranty issued by Crown.  In deciding to purchase his Kia Optima, Mr. Witcher relied on commercial advertisements about, among other things, Kia's reliability and safety ratings.  Mr. Witcher test drove the car prior to purchase.

38.    One month after purchase, in or around November 2017, Mr. Witcher's vehicle broke down.  He contacted Crown who arranged towing of the vehicle to Crown's Service Center. Upon inspection, Crown determined that the car was covered by Kia Recall No. 17V-224 and therefore sent Mr. Witcher's vehicle to Hendrick Kia of Concord located in Concord, North Carolina, for engine replacement. Mr. Witcher's engine was replaced by Kia of Concord's certified Kia technicians using certified Kia parts.

39.    About eight months later, on July 12, 2018, Mr. Witcher was driving down a road near his parent's home when he started to smell smoke, then shortly thereafter, flames began to shoot through

his heater and air conditioning vents.  Mr. Witcher was able to pull over and exit the vehicle without physical injury just in time: soon after he escaped the vehicle, the engine ignited, and the vehicle became engulfed in flames. The pictures below capture the fire and resulting damage:



*Mr. Witcher's vehicle engulfed in flames*

1
2
3
4
5
6
7
8
9
10
11
12
13
14



*Mr. Witcher's vehicle after the fire*

15
16
17
18
19
20
21
22
23
24
25
26
27
28



*Mr. Witcher's vehicle after the fire*



*Mr. Witcher's vehicle after the fire*

40.    Mr. Witcher would not have purchased the vehicle, or he would have paid less for it, had he known about the Engine Defect.

### Eduardo Silvera

41.    In June 2017, Plaintiff Silvera and his brother-in law purchased a new 2017 Kia Sorrento with a GDI engine from Kia of Riverside in Riverside, California. The vehicle came with the standard Kia 5-year/60,000-mile basic warranty and 10-year/100,000-mile powertrain warranty, with no optional extended warranties.

42.    Mr. Silvera is the only driver of this vehicle and is solely responsible for payments made on the vehicle's auto loan note and is the only named insured under the vehicle's Geico insurance policy.

43.    In deciding to purchase a Sorrento, Mr. Silvera relied on representations in Kia's advertising and information from a variety of reliable sources, including Consumer Reports and JD Powers, on the safety and reliability of the vehicle. Based on those representations and information, Mr. Silvera expected the vehicle to be both safe and reliable. Before purchasing, Mr. Silvera test drove the car and reviewed information contained on his car's Monroney sticker.

44. On December 17, 2018, Mr. Silvera received a "Product Improvement Campaign" notice from Kia requesting that he bring his vehicle in for installation of a software update that purports to "protect the engine from excessive connecting rod bearing damage."

45. Mr. Silvera is frustrated to learn that his engine is defective and unsafe. Mr. Silvera would not have purchased the vehicle, or he would have paid less for it, had he known about the Engine Defect.

**Melissa Gurtler**

46. In May 2014, Ms. Gurtler purchased a new 2014 Hyundai Santa Fe, with an extended warranty of a 7-year or 100,000 mile service contract, from Horne Hyundai of Apache Junction, Arizona.

47. Ms. Gurtler had considered the purchase carefully before making it, and bought it in part because of its reputation for reliability. In fact, she noted it had the number one safety record of comparable vehicles according to her research. She diligently kept up with maintenance.

48. In November 2017, Ms. Gurtler learned of a recall campaign, took her car in for inspection, and was told no replacement was necessary.

49. This proved to be untrue: In November 2018, Ms. Gurtler was driving the vehicle, which had only 60,000 miles on it, in San Carlos, Arizona when the battery light came on and the car shut off. She managed to get to the side of the road, where she noticed the hood was smoking. As she waited for assistance, flames started coming out of the hood. Then, the whole vehicle burst into flames within two minutes. The pictures below capture the fire and resulting damage:

1
2
3
4
5
6
7
8
9
10
11
12
13



*Ms. Gurtler's car on fire*

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*Ms. Gurtler's car engulfed in flames*



***Ms. Gurtler's vehicle after the fire***

50.     Ms. Gurtler would not have purchased the vehicle had she known about the Engine Defect.

### Claudia Galindo

51.     Ms. Galindo purchased a 2012 Kia Optima hybrid.

52.     In 2018, when Ms. Galindo's boyfriend was driving the car, the car broke down on the freeway in Nevada due to an engine issue that she later learned was the Engine Defect.

53.     She then took the car to the dealership, where it remained for over a month.  While the dealership represented that the issue that caused the break down was fixed, the engine issues persisted and, as such, the Engine Defect was not cured.

54.     Ms. Galindo later learned of the recall campaign for the Engine Defect.  However, she was told that her vehicle was not covered because it was a hybrid.

55.     Ms. Galindo would not have purchased the vehicle, or would have paid substantially less, had she known about the Engine Defect.

**Guan Perry**

56.    In April 2017, Mr. Perry purchased a pre-owned 2015 Kia Optima from Summit Place Kia in Clinton Township, Michigan for his wife's use. The vehicle was under warranty.

57.    In deciding to purchase a Kia Optima, Mr. Perry test drove it and understood it to be a reliable vehicle, and was certainly not aware of the Engine Defect.

58.    In February 2019, Mr. Perry's wife was driving the car when the engine abruptly ceased working due to the Engine Defect.

59.    The vehicle was immediately towed to the dealership. Although Mr. Perry's vehicle abruptly ceased as a result of the Engine Defect, Mr. Perry was told that this model of Kia was covered not under any recall for other Kia models. As a result, he is left still financing and insuring a vehicle with a non-working engine, which he is unable to drive.

60.    Mr. Perry would not have purchased the vehicle, or would have paid substantially less, had he known about the Engine Defect.

**Julie Esqueda**

61.    In April, 2014, Ms. Esqueda purchased a new 2014 Kia Optima.

62.    Ms. Esqueda had considered the purchase carefully before making it and bought the vehicle in part because of its reputation for reliability.

63.    Ms. Esqueda would not have purchased the vehicle, or would have paid substantially less, had she known about the Engine Defect.

**Susie Rexroad**

64.    In 2016, Ms. Rexroad purchased a used 2011 Kia Optima.

65.    Ms. Rexroad chose the Optima bought the vehicle in part because of its reputation for reliability, and thus was expecting the vehicle to be both safe and reliable.

66.    Ms. Rexroad would not have purchased the vehicle, or would have paid substantially less, had she known about the Engine Defect.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**A. Defendants' Gasoline Direct Injection engines contain a defect that causes engine failure and non-collision fires.**

67.     In 2009, after a 46-month research process, Defendants debuted a family of engines, "Theta II," with gasoline direct injection ("GDI") technology to be used in certain MY 2011 models of Hyundai Sonata, and Kia Optima, Sorento and Sportage vehicles.[8] This was the first in a series of engines with GDI technology, including the "Nu" and "Lambda II", that Defendants introduced in Class Vehicles.

68.     In GDI engines, a common fuel line uses high pressure to inject gasoline directly into the combustion chamber of each cylinder. The direct, high pressure injection provides precise control, thus increasing fuel economy.

69.     Both Hyundai and Kia boast of the quality of their GDI engines.

70.     Hyundai describes GDI technology as "the biggest advancement in fuel injection" and exclaims that the "Theta II GDI convincingly demonstrates Hyundai's advanced powertrain engineering capabilities.[9]

71.     Similarly, on its website, Kia describes the efficiency and quality its GDI engines:

> "[I]t's the Gasoline Direct Injection engine that helps a Kia deliver outstanding performance-in both power and fuel use. GDI injects highly-pressurized fuel directly into the cylinders during the engine's combustion cycle. The result is an increased quality of combustion and efficiency. By making smarter use of fuel, GDI also reduces emissions. What the driver experiences is still the most critical element of any powertrain technology. And with GDI, the driver enjoys smooth, powerful acceleration and a longer time between refueling."[10]

72.     But, in reality, Defendants' GDI engines contain a defect which poses an unreasonable safety risk to consumers. The Engine Defect restricts the flow of oil that lubricates and reduces the wear

---

[8] *Hyundai Develops Its First Gasoline Direct Injection Engine*, Hyundai (Nov. 17, 2009), https://www.hyundainews.com/en-us/releases/317 (last visited Mar. 19, 2019); *see also* Sam Abuelsamid, *Hyundai launches first direct-inject four-cylinder engine, replaces V6 in new Sonata*, AutoBlog.com, https://www.autoblog.com/2009/11/17/hyundai-launches-first-direct-inject-four-cylinder-engine-repla/ (last visited Mar. 19, 2019); Erik Johnson, *Hyundai Unveils New 2.4 Liter Direct-Injection Four-Cylinder (Updated with U.S. Specs)* CarandDriver.com, (Nov. 20, 2009), https://www.caranddriver.com/news/a18737484/hyundai-unveils-new-2-4-liter-direct-injection-four-cylinder/ (last visited Mar. 19, 2019).
[9] *See Hyundai Develops Its First Gasoline Direct Injection Engine*, Hyundai (Nov. 17, 2009), https://www.hyundainews.com/en-us/releases/317 (last visited Mar. 19, 2019).
[10] *Performance*, Kia, https://www.kia.com/us/en/content/why-kia/leadership/performance (last visited Mar. 19, 2019).

to moving parts of the engine, including but not limited to the piston and connecting rod bearings. Decreased oil flow causes premature wear of the engine components and, eventually, catastrophic engine failure. Premature wearing of parts can also knock holes into the engine, causing fluids to leak and igniting non-collision fires.

73.    Engine failure and spontaneous, non-collision fire poses a serious risk to the safety of not only Hyundai and Kia drivers, but passengers, other drivers, bystanders, and first responders.

74.    The existence of the Engine Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a vehicle. Had Plaintiffs and other Class Members known that Class Vehicles were equipped with the Engine Defect, they would not have purchased or leased Class Vehicles or would have paid less for them.

75.    Moreover, consumers, like Plaintiffs, reasonably expect that the engines in Class Vehicles are safe, will function in a manner that will not pose a safety hazard, and are free from defects. Plaintiffs and Class Members further reasonably expect that Hyundai and Kia will not sell or lease vehicles with known safety defects, such as the Engine Defect, and will disclose any such defects to consumers when it learns of them. Plaintiffs and Class Members did not expect Hyundai and Kia to fail to disclose the Engine Defect to them and to continually deny the defect.

**B.  For years, Defendants were aware of the Engine Defect.**

76.    Defendants had superior and exclusive knowledge of the Engine Defect and knew or should have known that the defect was not known or reasonably discoverable by Plaintiffs and Class Members before they purchased or leased the Class Vehicles.

77.    Upon information and belief, Plaintiffs allege that before Plaintiffs purchased their Class Vehicles, and since GDI engines first debuted in Class Vehicles, Defendants knew about the Engine Defect through sources in its exclusive custody and control and thus not available to consumers, including, but not limited to, pre-release testing data, consumer complaints about the Engine Defect to Defendants and their agents, testing conducted in response to those complaints, and high failure rates and replacement part sales data from Hyundai and Kia dealers.

78.    Moreover, upon information and belief, Defendants regularly monitor the NHTSA Vehicle Owner Questionnaire database for consumer complaints.

79.     By July 23, 2018, the NHTSA received over a 161 complaints of non-collision fires for MY 2011-2014 Hyundai Sonatas, MY 2011-2014, Hyundai Santa Fes, MY 2011-2014, Kia Sorentos, MY 2011-2014 Kia Optimas, and MY 2010-2015 Kia Souls.[11] 18 of those complaints of non-collision fires were reported between June 11, 2018 and July 23, 2018 alone.[12]

80.     Further, by June 7, 2018, the NHTSA received nearly 229 complaints describing smoke and burning odors caused by melted wires, indicative of a potential fire, for MY 2011-2014 Hyundai Sonatas, MY 2011-2014 Hyundai Santa Fes, MY 2011-2014 Kia Sorentos, MY 2011-2014 Kia Optimas.[13]

81.     Complaints of non-collision fires and potential fire indicators in Class Vehicles were abnormally high. By way of comparison, while the NHTSA received 120 complaints of non-collision fires of MY 2011-2014 Hyundai Sonatas, MY 2011-2014, Hyundai Santa Fes, MY 2011-2014, Kia Sorentos, MY 2011-2014 Kia Optimas by June 2018, in the same time frame, NHTSA received just 79 complaints of non-collision fires for *all competitor vehicles combined*.[14] In other words, reports of non-collision fires for NHTSA represented more than 60% of all non-collision fire complaints the NHTSA received for *all* vehicles.

82.     The complaints to the NHTSA indicate that the Engine Defect is widespread, and not confined to any one model year vehicle:

- 2012 Hyundai Sonata (Date of Incident: August 7, 2013) (NHTSA ID No. 1001581):

  HAD MY SONATA FOR LESS THAN A YEAR AND A HALF. I THOUGHT I SMELLED GAS IN THE CAR, BUT FIGURED I MUST HAVE SPILLED GAS ON MY SPORT COAT THE LAST TIME I WORE IT. STARTING THE CAR, I HAD TO HOLD THE START ENGINE BUTTON DOWN FOR AN EXTRA SECOND WHICH WAS WEIRD, BUT I FIGURED MAYBE I WAS LOOKING INTO THINGS. I HAD MY WINDOWS DOWN SINCE I THOUGHT I SMELLED GAS. AFTER DRIVING FOR A BIT MY CAR DIED SUDDENLY, AS I WAS PULLING OVER TO THE SIDE OF THE ROAD, I STARTED TO SMELL SMOKE. I GOT OUT OF THE CAR TO GET MY SON FROM HIS CAR SEAT AND THEN I SAW THAT THE FRONT OF THE CAR WAS ON FIRE.

---

[11] *See* Jason Levine, Addendum to Petition for Defect Investigation, Center for Auto Safety (Jul. 24, 2018), https://www.autosafety.org/wp-content/uploads/2018/06/Center-for-Auto-Safety-Addendum-to-June-11-2018-petition-regarding-Kia-Hyundai-fires.pdf (last visited Mar. 19, 2019).
[12] *Id.*
[13] *See* Levine, *supra* n. 2.
[14] *Id.*

***

- 2013 Hyundai Santa Fe (Date of Incident: August 13, 2015) (NHTSA ID No. 1210380)

WHEN DRIVING ON THE FREEWAY, VEHICLE LOST POWER AND SHUT OFF, SMELLED AND SAW SMOKE COMING FROM THE VENTS. PULLED TO SIDE OF ROAD AND OPENED HOOD TO CHECK ENGINE AND FLAMES SHOT OUT, CLOSED HOOD AND TRUCKERS RAN OVER WITH FIRE EXTINGUISHERS AND CALLED FIRE DEPARTMENT. WITHIN 5 MINUTES VEHICLE WAS TOTALLY ENGULFED AND FIRE DEPARTMENT HAD ARRIVED AND COULD ONLY PREVENT FLAMES FROM SPREADING TO SURROUNDING ENVIRONMENT. VEHICLE WAS TOTALLY CONSUMED BY THIS CATASTROPHIC FIRE. CALLED HYUNDAI CORPORATE OFFICES IN CALIFORNIA TO REPORT IT AS THE VEHICLE IS UNDER WARRANTY AND WAS ASKED 'WHAT DO YOU WANT US TO DO?'. RECEIVED THE IMPRESSION THAT THEY WERE NOT GOING TO DO ANYTHING ABOUT THIS.

***

- 2011 Kia Sorento (Date of Incident: July 7, 2010) (NHTSA ID No. 800468)

I WAS DRIVING ON THE MA TURNPIKE LATE MORNING WHEN I LOOKED IN MY REARVIEW MIRROR AND THE VIEW WAS CLOUDY.  I WASHED THE REAR WINDSHIELD AND KEPT ON DRIVING.  A FEW MINUTES LATER A MAN PULLED ALONG SIDE ME AND SIGNALED THAT I SHOULD PULL OVER.  I HAPPENED TO GLANCE IN THE REAR VIEW MIRROR AGAIN AND IT WAS CLOUDY AGAIN.  AS I WAS PULLING OVER I CHECKED THE DASHBOARD AND NO INDICATOR LIGHTS WERE ON.   I STOPPED THE CAR AND SMOKE STARTED TO COME OUT FROM UNDER THE HOOD. I GOT OUT AND STARTED WALKING AWAY FROM THE CAR WHILE CALLING MY HUSBAND. HE SUGGESTED I CALL 911 -- BY THE TIME I DIALED 911 (A TOTAL OF ABOUT 2.5 MINUTES FROM EXITING THE CAR) FLAMES WERE COMING OUT FROM UNDER THE HOOD.  BY THE TIME THE POLICE AND FIRE DEPARTMENT ARRIVED AT THE SCENE (ABOUT 15 TO 20 MINUTES AFTER I CALLED) THE ENTIRE CAR WAS ENGULFED IN FLAMES AND THE TIRES HAD STARTED TO EXPLODE. WHEN THE FIRE WAS FINALLY EXTINGUISHED ALL THAT REMAINED OF THE CAR WAS A BARE METAL FRAME.  THE CAR WAS TOTALLY DESTROYED.

***

- 2011 Kia Optima (Date of Incident: December 24, 2011) (NHTSA ID No. 899044)

THE CONTACT OWNED A 2011 KIA OPTIMA. THE CONTACT STATED THAT WHILE DRIVING 65 MPH, THE VEHICLE BEGAN TO DECELERATE ABNORMALLY. AFTER A FEW MOMENTS, THE VEHICLE SUDDENLY SURGED FORWARD. THE CONTACT MANEUVERED THE VEHICLE TO THE SHOULDER AND STOPPED. BLACK SMOKE THEN BEGAN TO RISE FROM UNDER THE HOOD AND THE VEHICLE WAS IMMEDIATELY ENGULFED INTO FLAMES. THE FIRE DEPARTMENT APPEARED ON THE SCENE TO EXTINGUISH THE FIRE. THE VEHICLE WAS DESTROYED AND TOWED TO A TOWING LOT. THE VEHICLE

WAS NOT EXAMINED FOR THE CAUSE OF FAILURE. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE AND OFFERED NO ASSISTANCE. THE FAILURE AND THE CURRENT MILEAGES WERE 7,000.

***

- 2012 Kia Sorento (Date of Incident: July 2, 2017) (NHTSA ID No. 899044)

AS I WAS DRIVING DOWNHILL ON I-15 JUST 3 MILES SOUTH OF SCIPIO, UT, I BEGAN TO NOTICE ISSUES WITH THE BRAKES AND ACCELERATOR. I GOT INTO THE FAR RIGHT LINE OF THE HIGHWAY AND NOTICED THAT SMOKE AND FLAMES CAME FROM UNDERNEATH THE HOOD. AS I PUT THE CAR IN PARK, THICK BLACK SMOKE CAME THROUGH THE AIR VENT. AS WE GOT OUT OF THE VEHICLE, I BREATHED IN A LITTLE BIT OF THE THICK SMOKE THAT CAME THROUGH THE AIR VENT, BUT MY WIFE DID NOT BREATHE ANY OF THE SMOKE. THE HOOD AREA WAS COMPLETELY ENGULFED IN FLAMES AFTER WE ESCAPED FROM THE VEHICLE. THE FIRE DEPARTMENT PUT OUT THE FIRE ABOUT 20 MINUTES AFTER THIS INCIDENT STARTED. EVERYTHING FROM THE FRONT OF THE CAR TO ABOUT HALF OF THE TRUNK AREA WAS DESTROYED.

83.     Upon information and belief, Defendants also review and analyze warranty data submitted by its dealerships and authorized technicians in order to identify defect trends in their vehicles. Defendants dictate that when a repair is made under warranty (or warranty coverage is requested), service centers must provide Defendants with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the part in case Defendants later determine to audit the dealership or otherwise verify the warranty repair. For their part, service centers are careful about providing this detailed information about in-warranty repairs to Defendants because, upon information and belief, Defendants will not pay the service centers for the repair if the complaint, cause, and correction are not sufficiently described.

84.     Moreover, as established designers and manufacturers of vehicles, Defendants likely conducted, or should have conducted, testing on its lines of GDI engines. Defendants confirm as much on their websites. On its website, Kia explains that "[w]e put our engines through rigorous testing."[15] Kia also conducts multiple forms of durability testing, including item durability and road testing, to "identify

---

[15] *Performance*, Kia, http://www.kia.com/worldwide/experience_kia/rnd/performance.do (last visited Mar. 19, 2019).

causes and find solutions to them to make our cars endure over a long time without fault."[16] Likewise, Hyundai explains that its "vehicles undergo extensive testing, too—from pushing engine performance in triple-digit heat and subzero arctic conditions to crashing over 100 cars to ensure safety measures before production even begins."[17]

85.    Given Defendants' representations of rigorous and comprehensive testing, Defendants knew or should have known that the GDI engines in Class Members' vehicles have the Engine Defect, exposing Plaintiffs and Class Members to an unreasonable safety risk.

**C.  Despite their awareness of the Engine Defect, Defendants have actively concealed its existence and the dangers it posed and have failed to take steps to fix it.**

86.    Defendants conceal the Engine Defect in its GDI engines and have failed to take adequate measures to address it.

**i.  Defendants conceal the existence of the Engine Defect in notices to technicians**

61.    As early as 2012, Defendants were aware of an "engine knocking noise" issue and issued technical service bulletins ("TSB") to authorized dealerships on the issue. A TSB is a document used by automotive manufacturers to inform dealership technicians about new information, including vehicle problems, new repair procedures, and improved parts. In TSB 12-EM-006, Hyundai advised that "[s]ome vehicles may experience an engine knock noise," but attributed the problem to the use of "aftermarket oil filter" which may "use different materials, construction and specifications than genuine Hyundai oil filters, which may lead to pressure variations within the engine, thus contributing to an engine knocking noise."

62.    Likewise, in TSB No. ENG114R1, Kia advised of concerns, including an "engine knocking noise" but attributed the problem to the use of "aftermarket oil filters or improper oil viscosity [that] **could** result in less than optimal filtration, leak down, oil flow rate and pressure variations."

63.    Neither Defendant's TSB identified the Engine Defect as the root cause of "engine knocking noise" in their GDI engines. And, rather than issue a recall, both Defendants instructed dealers

---

[16] *Id.*

[17] *Quality & Workmanship*, Hyundai, https://m.hyundaiusa.com/why-hyundai/quality.html (last visited Mar. 19, 2019).

to replace the oil filter and charge the owner for the filter and labor, rather than have it be covered by any warranty.

### ii. Hyundai and Kia issue limited recalls that do not cover all Class Vehicles and conceal the Engine Defect

#### a. Hyundai's 2015 recall

64.     On September 10, 2015, Hyundai issued a NHTSA recall, limited to only 470,000 MY 2011 and 2012 Sonatas with Theta II GDI engines. NHTSA Recall No. 15V-568. Hyundai reported "that metal debris may have been generated from factory machining operations as part of the manufacturing of the engine crankshaft during the subject production period."[18] Hyundai determined that metal debris caused a reduction of oil flow and premature engine wear, particularly in the engine's bearings, which can cause a "metallic, cyclic *knocking* noise which increases in frequency as the engine rpm increases" or illumination of the oil pressure lamp on the instrument panel (emphasis added).[19] Hyundai concluded that the failure of a bearing can cause an affected vehicle to "stall while in motion."[20]

65.     Hyundai reported that the issue was limited to engines manufactured in Hyundai's Alabama plant between December 11, 2009 and April 12, 2012.[21]

66.     Hyundai reassured the public that it had no reports of crashes or injuries.[22] But by the time of the recall, the NHTSA had received several complaints of non-collision fires and fire indicators in MY 2010 and 2011 Sonatas. Hyundai's recall does not warn of such a concern.

67.     Nor did the recall cover other Hyundai vehicles like the MY 2011 and 2012 Santa Fe, for which the NHTSA received complaints of non-collision fires, or the MY 2013 Sonata, for which the NHTSA received several complaints of fire indicators.

---

[18] 2011 Hyundai Sonata Recalls, NHTSA.gov, https://www.nhtsa.gov/vehicle/2011/HYUNDAI/SONATA/4%252520DR/FWD%252520Latest%252520Release#recalls (last visited Mar. 19, 2019).
[19] *Id.*
[20] *Id.*
[21] Acknowledgement of Safety Recall, NHTSA, https://static.nhtsa.gov/odi/rcl/2015/RCAK-15V568-8864.pdf (last visited Mar. 19, 2019).
[22] Part 573 Safety Recall Report for 15V-568, NHTSA, https://static.nhtsa.gov/odi/rcl/2015/RCLRPT-15V568-9490.PDF (last visited Mar. 19, 2019).

68.    Moreover, Hyundai's NHTSA Defect Investigation Report ("DIR") for the 2015 recall, like its 2012 TSB, did not identify the Engine Defect as the root cause of engine stalling in the "Theta II" engines.

**b.  A whistleblower reveals that more Hyundai vehicles should have been recalled but Hyundai successfully blocks the release of internal documents on an alleged engine defect**

69.    In August 2016, months after Hyundai's recall, Kim Gwang-ho, an engineer at Hyundai for 26 years who worked on the Quality Strategy team responsible for recall decisions, flew from South Korea to Washington, D.C. to report to the NHTSA that Hyundai was not taking enough action to address an engine fault that increased the risk of crashes.[23] Kim contended that Hyundai knew the engine issue was more serious and widespread than reported. And, Kim noted, the problem was not just with the manufacturing process, as indicated by Hyundai's 2015 recall, but also with the engine design, which would mean, as Kim explained, that Hyundai would need to fix engine in all the affected cars, at a high cost.[24]

70.    Kim cited to an internal report from his Quality Strategy team to Hyundai management as the basis for his accusation but before Reuters or any other press outlet could review the report, Hyundai successfully obtained a court injunction to block its release.[25]

**c.  Hyundai 2017 recall**

71.    On March 31, 2017, Hyundai recalled 572,000 Sonata and Santa Fe Sport vehicles containing Theta II GDI engines, noting that "bearing wear may result in engine seizing, increasing the risk of a crash." NHTSA Recall No. 17V-226.

72.    The recall of Sonatas covered MY 2013 and 2014 Sonatas with 2.0L or 2.4L Theta II GDI engines manufactured in Hyundai's Alabama plant between March 21, 2012 and May 29, 2013. As described above, by the time of the 2015 recall, the NHTSA had already received complaints of fire indicators in MY 2013 Sonatas.

---

[23] Hyunjoo Jin, *Blowing the Whistle in South Korea: Hyundai Man Takes on Chaebol Culture*, Reuters (May 15, 2017), https://www.reuters.com/article/us-hyundai-whistleblower/blowing-the-whistle-in-south-korea-hyundai-man-takes-on-chaebol-culture-idUSKCN18B0J5 (last visited Mar. 19, 2019).
[24] *Id.*
[25] *Id.*

73.     The Santa Fe Sport recall covered MY 2013 and 2014 Santa Fe Sport vehicles with 2.0L or 2.4L engines produced at Kia Motor Manufacturing in Georgia.

74.     Again, Hyundai blamed a manufacturing issue, explaining that "[m]achining errors during the engine manufacturing process may cause premature bearing wear within the engine."[26] Specifically, Hyundai noted that engines in the covered vehicles "may contain residual debris from factory machining operations, potentially restricting oil flow to the main bearings and leading to premature bearing wear."[27] Again, Hyundai noted that the engines may produce a "knocking noise," explaining that it may come from "worn connecting rod bearing."[28] Hyundai cautioned that, over time, "the bearing may fail and the vehicle could lose motive power while in motion."

75.     Again, Hyundai noted that there were no reports of accidents or injuries.[29] But by March 31, 2017, there were several complaints to the NHTSA of non-collision fires and fire indicators for covered vehicles. Hyundai's recall does not warn of such a concern.

76.     Once again, the recall did not cover other Hyundai vehicles like the MY 2011 and 2012 Santa Fe, for which the NHTSA received complaints of non-collision fires, or the MY 2013 Sonata, for which the NHTSA received complaints of fire indicators.

77.     Moreover, Hyundai's DIR for the 2017 recall, like its 2012 TSB, did not identify the Engine Defect as the root cause of engine stalling in the "Theta II" engines.

### d.  Kia's 2017 recall

78.     At the same time as Hyundai's 2017 recall, Kia issued its own recall of 618,160 MY 2011-2014 Optima, MY 2012-2014 Sorento, and MY 2011-2013 Sportage vehicles (Recall No. 17V-224) due to stalling of their "Theta II" engines.

---

[26] 2013 Hyundai Sonata Recalls, NHTSA.gov, https://www.nhtsa.gov/vehicle/2013/HYUNDAI/SONATA/4%252520DR/FWD#recalls (last visited Mar. 19, 2019).
[27] Part 573 Safety Recall Report for 17V-226, NHTSA, https://static.nhtsa.gov/odi/rcl/2017/RCLRPT-17V226-4558.pdf (last visited Mar. 19, 2019).
[28] *Id.*
[29] *Id.*

79.     For more than a year and a half prior to its recall, Kia was aware that the same "Theta II" engines were the subject of the September 2015 recall by Hyundai for precisely the same engine stalling issue.[30]

80.     In fact, Kia's DIR for Recall No. 17V-224 described the basis for its recall using nearly *identical* language to Hyundai's DIR for its September 2015 recall.[31] Kia, just like Hyundai over a year and a half earlier, noted that "metal debris" "can restrict oil flow to the bearings, thereby increasing bearing temperatures causing premature bearing wear."[32] The DIR further noted that a worn connecting rod bearing "will produce a cyclic knocking noise from the engine" and the warnings are ignored "the bearing may fail and the vehicle could stall while in motion."[33] Kia's DIR only added "uneven surface" caused by "the additional machining processes of the crankpins" as an additional source of oil restriction.

81.     Though it was aware of Hyundai's September 2015 recall of vehicles containing "Theta II" engines at the time it was issued, Kia explained that it did not conduct a recall because its "Theta II" engines were manufactured on a "separate assembly line," had "different procedures" and no "issues."[34]

82.     But Kia knew that its Class Vehicles with "Theta II" engines contained the Engine Defect and that the engine stalling problem with "Theta II" engines was not limited to Hyundai's vehicles. In fact, in a chronology of events submitted to the NHTSA, Kia notes that in early 2016, an engine manufacturer, Translead, "identifie[d] [an] *oil delivery issue* with Theta GDI engines" in Kia's Optima, Sportage and Sorento vehicles."[35]

83.     Despite knowledge of the Engine Defect and notice of Hyundai's recall of vehicles containing precisely the same Theta II engine as well as an "oil delivery issue" in certain Class Vehicles

---

[30] Basis for Safety Defect Determination, NHTSA, https://static.nhtsa.gov/odi/rcl/2017/RMISC-17V224-3802.pdf (last visited Mar. 19, 2019).
[31] *Compare* Part 573 Safety Recall Report for 17V-224, NHTSA, https://static.nhtsa.gov/odi/rcl/2017/RCLRPT-17V224-2355.PDF (last visited Mar. 19. 2019) *with* Part 573 Safety Recall Report for 15V-568, NHTSA, https://static.nhtsa.gov/odi/rcl/2015/RCLRPT-15V568-9490.PDF (last visited Mar. 19, 2019).
[32] Part 573 Safety Recall Report for 17V-224, NHTSA, https://static.nhtsa.gov/odi/rcl/2017/RCLRPT-17V224-2355.PDF (last visited Mar. 19, 2019).
[33] *Id.*
[34] *See supra* n. 30; *see also* ODI Resume, NHTSA, https://static.nhtsa.gov/odi/inv/2017/INOA-RQ17003-7178.PDF (last visited Mar. 19, 2019).
[35] *See supra* n. 30.

CLASS ACTION COMPLAINT

as identified by an engine manufacturer, Kia waited more than a year and a half after Hyundai's first recall before issuing its own recall.

84. Moreover, at the time of Hyundai's September 10, 2015 recall, there were at least 13 non-collision fires to MY 2011-2013 Optima and MY 2011-2014 Sorento vehicles reported to the NHTSA.[36] Rather than mitigate the risk of harm to consumers, Kia committed to concealing the Engine Defect and delay in recalling any Class Vehicle.

85. Kia's failure to promptly issue a recall following Hyundai's recall placed consumers at an unreasonable risk to their safety.

86. Indeed, between September 10, 2015—the date of Hyundai's recall—and March 31, 2017—the date of Kia's recall—19 *more* Class Vehicles caught fire in non-collision contexts.[37]

87. The fact that Kia did not promptly issue a recall upon learning of Hyundai's recall was not lost on NHTSA. NHTSA opened an investigation into the "timeliness and scope" of Kia's 2017 recall" (No. RQ 17-003) which remains ongoing.[38]

88. Like Hyundai's recalls, Kia's 2017 recall was narrow in scope. It did not include the MY 2011 Kia Sorento even though by March 31, 2017—the date of its recall—that model year vehicle was the subject of 7 NHTSA complaints of non-collision fires.[39]

89. Moreover, Kia's DIR for the 2017, like its 2012 TSB, did not identify the Engine Defect as the root cause of engine stalling in the "Theta II" engines.

### iii. Given their inadequate scope, Defendants' 2015 and 2017 recalls fail to decrease the safety risk to consumers

90. Because Hyundai and Kia's 2015 and 2017 recalls were limited in scope and Hyundai and Kia continued to conceal the existence of the Engine Defect, Class Vehicles continued pose safety risks to consumers after the recalls. This safety risk is best evidenced by the fact that after the March 2017

---

[36] Spreadsheet of non-collision fire complaints to NHTSA, Center for Auto Safety, http://www.autosafety.org/wp-content/uploads/2018/10/All-NHTSA-Fire-Complaints-in-Subject-Vehicles-as-of-October-11-Data.xlsx (last visited Mar. 19, 2019).
[37] *Id.*
[38] ODI Resume, NHTSA, https://static.nhtsa.gov/odi/inv/2017/INOA-RQ17003-7178.PDF (last visited Mar. 19, 2019).
[39] *See supra* n. 36.

1  recall, there were roughly 70 additional non-collision fires of MY 2011-2014 Optima and MY 2011-2014

2  Sorento vehicles reported to the NHTSA.[40]

3      91.    Even cars that were specifically serviced by Hyundai and Kia pursuant to the 2017 recall

4  experienced fires. Indeed, Plaintiff Witcher received an engine replacement for his Kia Optima after Kia's

5  2017 recall but months later, his car went up in flames and was rendered a total loss.

6      92.    Likewise, the Center for Auto Safety reported that at least a dozen consumers who had

7  their cars serviced pursuant to the 2017 recall went on to experience a non-collision fire.[41] By way of an

8  example, an owner of this MY 2012 Kia Optima experienced a stalled engine and a fire even after he

9  turned in his vehicle as part of a recall:

> I WAS NOTIFIED BY KIA EARLIER THIS YEAR THAT MY VEHICLE WAS INVOLVED IN A RECALL BECAUSE THE ENGINE COULD SEIZE CAUSING A SAFETY ISSUE. **ON 6/12/17 I TOOK MY OPTIMA TO CAMELBACK KIA FOR RECALL WORK AND INSPECTION**. ON 8/1/2017 AS I WAS DRIVING NORTHBOUND ON AZ SR51, MY ENGINE STALLED WHILE MOVING ABOUT 40 MPH IN RUSH HOUR TRAFFIC. I THEN PULLED OVER TO RESTART MY VEHICLE, **A SHORT TIME LATER I NOTICED SMOKE COMING FROM UNDER THE HOOD. I WAS TOLD BY KIA UPON THEIR INSPECTION THAT THE STARTER IS WHERE THE  FIRE ORIGINATED DUE TO THE SEIZED ENGINE**. THE VEHICLE BURNED AND IS NOW A TOTAL LOSS. THIS CAUSED A 3 LANE CLOSURE ON THE FREEWAY AT 5PM AS WELL AS A CRASH DUE TO SPECTATORS.

NHTSA Complaint No. 11016332 (emphasis added).

    93.    Similarly, an owner of a MY 2013 Hyundai Sonata had his engine replaced as part of the

2017 but experienced a fire just *a day and half* later.

> SONATA RECALL ON APRIL 14, 2017 DRIVING AT 65 MPH ON I 75 MY ENGINE EXPLODED AND I SUCCESSFULLY WAS ABLE TO MANEUVER TO THE SHOULDER. **I HA [SIC] BE SUBSEQUENTLY BEEN SENT A RECALL FROM HYUNDAI ABOUT THIS DANGEROUS DEFECT THAT THEY HAVE BEEN AWARE OF FOR OVER 18 MONTHS**. HOWEVER THE DESTRUCTION DOES NOT END THERE. **HYUNDAI MOTORS OF NORTH AMERICA REPLACED THE BLOWN ENGINE WITH A NEW MODEL ENGINE AND AFTER I HAD BEEN DRIVING THE VEHICLE AGAIN FOR 36 HOURS AND UNDER 300 MILES...THE NEW ENGINE CAUGHT ON FIRE TOTALLY DESTROYING MY VEHICLE** AGAIN DUE TO MY DILGENCE

---

[40] *See supra* n. 36.
[41] *See* Jason Levine, Letter to Kia, Center for Auto Safety (Oct.12, 2018), https://www.autosafety.org/wp-content/uploads/2018/10/letter-to-Kia-1.pdf (last visited Mar. 19, 2019).

[SIC] AND THE CINCINNATI FIRE DEPARTMENT WE WERE ABLE TO EXTINGUISH THE FIRE WITH DAMAGE TO OTHER PEOPLE OR PROPERTY.  HYUNDAI HAS SERIOUS QUALITY CONTROL ISSUES. THE CAR WAS ON 4 TH STREET IN DOWNTOWN CINCINNATI WHEN THE FIRE BROKE OUT.

NHTSA Complaint No. 1394767 (emphasis added).

94.    Alarmed by the large volume of non-collision vehicle fires, on June 11, 2018, the Center for Auto Safety petitioned NHTSA to initiate a safety defect investigation and issue a recall order of all MY 2011-2014 Hyundai Sonata and Santa Fe, and Kia Optima and Sorento vehicles.[42]

95.    On July 24, 2018, the Center for Auto Safety filed an addendum to its original petition, requesting NHTSA expand the investigation to include MY 2010-2015 Kia Soul vehicles.[43]

96.    The addendum also noted that in the few weeks since its June 11, 2018 petition, the 18 more reports of non-collision fires of Sonatas, Santa Fes, Optimas, and Sorentos were reported to the NHTSA.[44]

97.    The Center warned that until a comprehensive recall and remedy to the latent defects, Hyundai and Kia drivers "and those who share the road with them, face the horrifying risk of serious injury and death by fire."[45]

98.    In October 2018, the Center increased the pressure, publicly calling on Kia to recall all MY 2011-2014 Sorento and Optima, and MY 2010-2015 Soul vehicles given a significant risk of non-collision fires.[46]

**iv. Not only did Hyundai and Kia's 2017 recalls fail to decrease the risk to consumers' safety, it in fact *increased* that risk to consumers who had their cars serviced, triggering yet another recall.**

99.    On January 16, 2019, Hyundai and Kia succumbed to public pressure to issue additional recalls.

100.    But these two  recent recalls only underscore the inadequacy of Hyundai and Kia's prior recalls and Hyundai and Kia's continued effort to conceal the Engine Defect.

---

[42] *See* Levine, *supra* n. 2.
[43] *See* Levine, *supra* n. 11.
[44] *Id.*
[45] *Id.*
[46] *See* Levine, *supra* n. 41.

1    101.    Hyundai and Kia publicly acknowledged that engine replacements performed in prior

2    recalls may have not been properly done.[47]

3    102.    Hyundai's recall is limited to just 100,000 MY 2011-2014 Hyundai Sonatas and Santa Fe

4    Sports vehicles whose engines were replaced under Hyundai's previous two recalls. The purpose of the

5    recall is to inspect and confirm proper reinstallation of the fuel tube to the high-pressure fuel pump.[48]

6    103.    Despite dozens of non-collision fires reported to the NHTSA, Hyundai reports that it

7    was "not aware of any fires caused this issue."[49]

8    104.    Likewise, Kia's recent recall is limited to just 68,000 MY 2011-2014 Optima, Sorento and

9    Sportage vehicles that were serviced during the 2017 recall and had their engines replaced. The purpose

10   is to confirm that a high-pressure fuel pipe was properly installed to the fuel pump outlet because "[i]n

11   some cases, the high pressure fuel pipe may have been damaged, misaligned or improperly torqued during

12   the engine replacement procedure, allowing fuel to leak increasing the risk of fire. KMA is not aware of

13   any accidents or injuries as a result of this issue."[50] Stated otherwise, consumers who got their vehicles

14   serviced pursuant to the 2017 recall may have increased the risk to their safety.

15   105.    Kia's January 2019 recall is confined to 68,000 vehicles already serviced under the 2017

16   recall. But this recall fails to include all Class Vehicles, including all model years that have experienced

17   non-collision fires.

18   106.    Notably, though the NHTSA has received complaints about MY 2010-2015 Kia Souls

19   and the 2011 Kia Sorento, the latest recall fails to consider include those models in its recall.

20   107.    Once again, neither Hyundai nor Kia failed to identify the Engine Defect in any statement

21   on their recent recalls.

22

23

24

25

---

26   [47] Hyundai, Kia Recall Vehicles Due to Increased Fire Risk, ABC13 (Jan. 17, 2019),
     https://abc13.com/hyundai-kia-recall-vehicles-due-to-increased-fire-risk/5092521/ (last visited Mar. 9,

27   2019).
     [48] *See supra* n. 6.

28   [49] *Id.*
     [50] *See supra* n. 5.

CLASS ACTION COMPLAINT

## CLASS ACTION ALLEGATIONS

108.    Pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and Nationwide Class and State Classes, defined as follows:

> Nationwide Class:
> All persons or entities residing in the United States who are current or former owners and/or lessees of a Class Vehicle.

109.    In addition to the Nationwide class, and pursuant to Federal Rules of Civil Procedure Rule 23(c)(5), Plaintiffs seek to represent the following State Classes as well as any subclasses or issue classes as Plaintiffs may propose and/or the Court may designate at the time of class certification:

> California Class:
> All persons or entities residing in California who are current or former owners and/or lessees of a Class Vehicle.

> Arizona Class:
> All persons or entities residing in Arizona who are current or former owners and/or lessees of a Class Vehicle.

> Michigan Class:
> All persons or entities residing in Michigan who are current or former owners and/or lessees of a Class Vehicle.

> North Carolina Class:
> All persons or entities residing in North Carolina who are current or former owners and/or lessees of a Class Vehicle.

110.    Excluded from the Classes are Defendants, their affiliates, employees, officers and directors, persons or entities that purchased the Class Vehicles for resale, and the Judge(s) assigned to this case. Plaintiffs reserve the right to modify, change, or expand the Class definitions based on discovery and further investigation.

111.    The questions here are ones of common or general interest class that there is a well-defined community of interest among the class members. These questions predominate over questions that may affect only individual class members because Defendants has acted on grounds generally applicable to the class.  Such common legal or factual questions include, but are not limited to:

> a.    Whether the Class Vehicles were sold with a defect;

b. Whether Defendants knew or should have known of the defect and if so, when should Defendants know or should have known of the defect;

c. Whether a reasonable consumer would consider the defect or its manifestation to be material;

d. Whether Defendants have a duty to disclose the defect to Plaintiffs and Class Members;

e. Whether Defendants failed to disclose the defect;

f. Whether Defendants actively concealed the defect;

g. Whether Class Vehicles suffer from a defect or defects relating to the GDI engines;

h. Whether the defects relating to the GDI engines constitute an unreasonable safety risk;

i. Whether Plaintiffs and the other Class Members are entitled to equitable relief, including but not limited to a preliminary and/or permanent injunction and restitution;

j. Whether Defendants should be declared financially responsible for notifying all Class Members of the problems with the Class Vehicles and for the costs and expenses of repairing and replacing the defective GDI engines;

k. Whether Defendants are obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace their defective engine;

l. Whether Defendants breached the implied warranty of merchantability pursuant to the Magnuson-Moss Warranty Act; and

m. Whether Defendants breached the implied warranty of merchantability.

112.    Members of the Class are so numerous that joinder is impracticable. While the exact number of class members is unknown to Plaintiffs, it is believed that the each State Class comprises thousands of members geographically disbursed throughout each state.

113.    It is impracticable to bring Class members' individual claims before the Court. Class treatment permits a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender.  The benefits of the class mechanism, including providing injured persons or

entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

114. Plaintiffs' claims are typical of the members of the Class and all subclasses, as all members of the class are similarly affected by Defendants' actionable conduct. Plaintiffs and all members of the class owned or leased Class Vehicles. In addition, Defendants' conduct that gave rise to the claims of Plaintiffs and members of the class (*inter alia*, failing to disclose a defect in Class Vehicles) is the same for all members of the Class.

115. Plaintiffs will fairly and adequately protect the interests of the Class because they have no interests antagonistic to, or in conflict with, the Class that Plaintiff seeks to represent. Furthermore, Plaintiffs have retained counsel experienced and competent in the prosecution of complex class action litigation.

116. Plaintiffs know of no difficulty to be encountered in this action that would preclude its maintenance as a class action.

117. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

## CAUSES OF ACTION
### A. CONSUMER PROTECTION STATUTE CLAIMS
### FIRST CAUSE OF ACTION
### Violations of California Unfair Competition Law
### (Cal. Bus. & Prof. Code § 17200, *et seq.*)

118. Plaintiffs reallege and incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

119. Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class, or, in the alternative, Plaintiffs Silvera, Esqueda, and Rexroad bring this claim on behalf of the California Class.

120. The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

121.    Defendants have engaged in unfair competition and unfair, unlawful or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiffs and the Class Members that the Class Vehicles suffer from a defect (and the costs, safety risks, and diminished value of the vehicles as a result of these problems).

122.    Defendants should have disclosed this information because they were in a superior position to know the true facts related to the defect, and Plaintiffs and Class Members could not reasonably be expected to learn or discover the true facts related to the defect.

123.    The Engine Defect constitutes a safety issue that triggered Defendants' duty to disclose the safety issue to consumers.

124.    These acts and practices have deceived Plaintiffs and are likely to deceive the public. In failing to disclose the defect and suppressing other material facts from Plaintiffs and the Class Members, Defendants breached its duties to disclose these facts, violated the UCL, and caused injuries to Plaintiffs and the Class Members. The omissions and acts of concealment by Defendants pertained to information that was material to Plaintiffs and the Class Members, as it would have been to all reasonable consumers.

125.    The injuries suffered by Plaintiffs and the Class Members are greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiffs and the Class Members should have reasonably avoided.

126.    Defendants' acts and practices are unlawful because they violate, inter alia, California Business and Professions Code §§ 1750, 17500, *et seq.*

127.    Plaintiffs seek to enjoin further unlawful, unfair and/or fraudulent acts or practices by Defendants, to obtain restitutionary disgorgement of all monies and revenues generated as a result of such practices, and all other relief allowed under the UCL.

## SECOND CAUSE OF ACTION
### Violations of False Advertising Law
**(California Business and Professions Code § 17500, *et seq.*)**

128.    Plaintiffs Witcher and Silvera incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

129.    Plaintiffs Witcher and Silvera bring this claim on behalf of themselves and on behalf of the Nationwide Class, or, in the alternative, Plaintiffs Silvera bring this claim on behalf of the California Class.

130.    California Business & Professions Code § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

131.    Defendants caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including Plaintiffs Witcher and Silvera and the other Class Members.

132.    Defendants have violated section 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of its Class Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer. Plaintiffs Witcher and Silvera and the other Class Members have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Class Vehicles, Plaintiffs Witcher and Silvera and the other Class Members relied on the misrepresentations and/or omissions of Defendants with respect to the safety and reliability of the Class Vehicles. Defendants' representations were untrue because the Class Vehicles are distributed with the Engine Defect.

133.    Had Plaintiffs Witcher and Silvera and the other Class Members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them. Accordingly, Plaintiffs Witcher and Silvera and the other Class Members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

134.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of California and nationwide.

135.    Plaintiffs Witcher and Silvera, individually and on behalf of the other Class Members, request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs Witcher and Silvera and the other Class Members any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

### THIRD CAUSE OF ACTION
### Violations of the California Consumers Legal Remedies Act
### (Cal. Civ. Code § 1750 *et seq.*)

136.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

137.    Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class, or, in the alternative, Plaintiffs Silvera, Esqueda, and Rexroad bring this claim on behalf of the California Class.

138.    Defendants are each a "person" as that term is defined in California Civil Code § 1761(c).

139.    Plaintiffs and the Class Members are "consumers" as that term is defined in California Civil Code §1761(d).

140.    Defendants engaged in unfair and deceptive acts in violation of the CLRA by the practices described above, and by knowingly and intentionally concealing from Plaintiffs and Class Members that the Class Vehicles suffer from a defect(s) (and the costs, risks, and diminished value of the vehicles as a result of this problem). These acts and practices violate, at a minimum, the following sections of the CLRA: (a)(2) Misrepresenting the source, sponsorship, approval or certification of goods or services; (a)(5) Representing that goods or services have sponsorships, characteristics, uses, benefits or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation or connection which he or she does not have; (a)(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and (a)(9) Advertising goods and services with the intent not to sell them as advertised.

1    141.   Defendants' unfair or deceptive acts or practices occurred repeatedly in their trade or

2    business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious

3    safety risk on the public.

4    142.   Defendants knew that the Class Vehicles and GDI Engines were defectively designed or

5    manufactured and were not suitable for their intended use.

6    143.   The recalls and TSBs have, to date, not been adequate to remedy the Engine Defect.

7    144.   Defendants were under a duty to Plaintiffs and the Class Members to disclose the

8    defective nature of the Class Vehicles because: a) Defendants were in a superior position to know the

9    true state of facts about the Engine Defect and associated repair costs; b) Plaintiffs and the Class

10   Members could not reasonably have been expected to learn or discover that the Class Vehicles and their

11   engine had a dangerous defect until manifestation of the defect; c) Defendants knew that Plaintiffs and

12   the Class Members could not reasonably have been expected to learn of or discover the defect and the

13   associated repair costs that it causes until the manifestation of the defect; and d) Defendants actively

14   concealed the defect and the associated repair costs.

15   145.   In failing to disclose the Engine Defect and the associated safety risks and repair costs

16   that result from it, Defendants have knowingly and intentionally concealed material facts and breached

17   its duty not to do so.

18   146.   The facts concealed or not disclosed by Defendants to Plaintiffs and the Class Members

19   are material in that a reasonable consumer would have considered them to be important in deciding

20   whether to purchase Class Vehicles or pay a lesser price. Had Plaintiffs and the Class known about the

21   defective nature of the Class Vehicles and their engines, they would not have purchased the Class Vehicles

22   or would have paid less for them.

23   147.   Plaintiffs, on behalf of themselves and the Class, seek an order enjoining Defendants'

24   unfair or deceptive acts or practices, equitable relief, an award of attorneys' fees and costs under Cal. Civ.

25   Code § 1780(e).

26   148.   Plaintiffs and Class Members reserve the right to give statutory written notice of this claim

27   via certified mail, and to thereafter seek damages via an amended complaint.

28

**FOURTH CAUSE OF ACTION**

**Arizona Consumer Fraud Act**

**(A.R.S § 44-1521 *et seq.*)**

149.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

150.    Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class, or, in the alternative, Plaintiff Gurtler brings this claim on behalf of the Arizona Class.

151.    The Arizona Consumer Fraud Act provides that "[t]he act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." A.R.S § 44-1522(A).

152.    Defendants are "persons" within the meaning of A.R.S § 44-1521(6).

153.    Class Vehicles sold in Arizona are "merchandise" within the meaning of A.R.S § 44-1521(5).

154.    Defendants engaged in unfair and deceptive acts in violation of the Arizona Consumer Fraud Act by the practices described above, and by knowingly and intentionally concealing from Plaintiffs and Class Members that the Class Vehicles suffer from a defect(s) (and the costs, risks, and diminished value of the vehicles as a result of this problem). That is, in selling Class Vehicles with an Engine Defect, Defendants systematically acted with a tendency or capacity to deceive. Defendants engaged in unlawful practices by employing deception, deceptive or unfair practices, fraud, false pretenses, false promises, misrepresentations, or concealment, suppression or omission of material facts with intent that others rely upon such concealment, suppression or omission, in connection with the sale or lease of Class Vehicles.

155.    By actively advertising, marketing, selling, and leasing Class Vehicles with the Engine Defect, Defendants engaged in deceptive and unfair business practices in violation of the Arizona Consumer Fraud Act.

156.    Defendants misrepresented material facts regarding Class Vehicles with intent to mislead consumers to purchase or lease Class Vehicles, which were materially different and inferior to the vehicles that were represented to consumers as being for lease or sale.

157.    While engaging in the unlawful acts and practices alleged in this Complaint, Defendants have at all times acted "willfully" as defined in A.R.S § 44-1531. That is, Defendants knew or should have known that their conduct was of the nature prohibited by the Arizona Consumer Fraud Act.

158.    Defendants' unfair or deceptive acts or practices occurred repeatedly in their trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious, and continuing, safety risk on the public.

159.    The recalls and TSBs have, to date, not been adequate to remedy the Engine Defect.

160.    Defendants were under a duty to Plaintiffs and the Class Members to disclose the defective nature of the Class Vehicles because: a) Defendants were in a superior position to know the true state of facts about the Engine Defect and associated repair costs; b) Plaintiffs and the Class Members could not reasonably have been expected to learn or discover that the Class Vehicles and their engine had a dangerous defect until manifestation of the defect; c) Defendants knew that Plaintiffs and the Class Members could not reasonably have been expected to learn of or discover the defect and the associated repair costs that it causes until the manifestation of the defect; and d) Defendants actively concealed the defect and the associated repair costs.

161.    Plaintiffs, individually and on behalf of the other Class Members, request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the other Class Members any money Defendants acquired by unfair competition, including damages for willful violations, restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## FIFTH CAUSE OF ACTION

### Michigan Consumer Protection Act

### (Mich. Comp. Laws §§ 445.901 *et seq.*)

162.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

163.    Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class, or, in the alternative, Plaintiff Perry brings this claim on behalf of the Michigan Class.

164.    An "[u]nfair, unconscionable, or deceptive method, acts, or practices in the conduct of trade or commerce" in violation of the Michigan Consumer Protection Act includes "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer. Mich. Comp. Laws § 445.903(s).

165.    Defendants engaged in within the meaning of Mich. Comp. Laws § 445.902(g).

166.    Defendants are "persons" within the meaning of Mich. Comp. Laws § 445.902(d).

167.    Plaintiffs and Class Members are consumers and Defendants are sellers and therefore subject to the Michigan Consumer Protection Act.

168.    Defendants' statements, representations, omissions, and practices made in connection with their sale or lease of Class Vehicles as alleged herein were in violation of the following sections of the MCPA § 445.903: (p) by disclaiming or limiting the implied warranty of merchantability and fitness for use, without clearly and conspicuously disclosing a disclaimer and (cc) by failing to reveal facts which are material to the transaction in light of representations of fact made in a positive manner.

169.    Defendants engaged in unfair, unconscionable, and deceptive acts in violation of the Michigan Consumer Protection Act by the practices described above, and by knowingly and intentionally concealing from Plaintiffs and Class Members that the Class Vehicles suffer from a material defect(s) (and the costs, risks, and diminished value of the vehicles as a result of this problem).

170.    By actively advertising, marketing, selling, and leasing Class Vehicles with the Engine Defect, Defendants engaged in deceptive and unfair business practices in violation of the Michigan Consumer Protection Act.

171.    Plaintiffs relied on Defendants' statements on the quality and reliability of Class Vehicles in making their purchases.

172.    Defendants' unfair or deceptive acts or practices occurred repeatedly in their trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious, and continuing, safety risk on the public.

173.    The recalls and TSBs have, to date, not been adequate to remedy the Engine Defect.

174. Defendants were under a duty to Plaintiffs and the Class Members to disclose the defective nature of the Class Vehicles because: a) Defendants were in a superior position to know the true state of facts about the Engine Defect and associated repair costs; b) Plaintiffs and the Class Members could not reasonably have been expected to learn or discover that the Class Vehicles and their engine had a dangerous defect until manifestation of the defect; c) Defendants knew that Plaintiffs and the Class Members could not reasonably have been expected to learn of or discover the defect and the associated repair costs that it causes until the manifestation of the defect; and d) Defendants actively concealed the defect and the associated repair costs.

175. Plaintiffs, individually and on behalf of the other Class Members, request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the other Class Members any money Defendants acquired by unfair competition, including actual damages, and for such other relief set forth below.

## SIXTH CAUSE OF ACTION
### North Carolina Unfair and Deceptive Trade Practices Act
### (N.C. Gen. Stat. §§ 75-1.1 *et seq.*)

176. Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

177. Plaintiffs bring this claim on behalf of themselves and on behalf of the Nationwide Class, or, in the alternative, Plaintiff Witcher brings this claim on behalf of the North Carolina Class.

178. The North Carolina Unfair and Deceptive Trade Practices Act prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. §§ 75-1.1(a).

179. Defendants have engaged in unfair competition and unfair, unlawful or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiffs and the Class Members that the Class Vehicles suffer from a defect (and the costs, safety risks, and diminished value of the vehicles as a result of these problems).

180. Defendants should have disclosed this information because they were in a superior position to know the true facts related to the defect, and Plaintiffs and Class Members could not reasonably be expected to learn or discover the true facts related to the defect.

181.    The Engine Defect constitutes a safety issue that triggered Defendants' duty to disclose the safety issue to consumers.

182.    These acts and practices have deceived Plaintiffs and are likely to deceive the public. In failing to disclose the defect and suppressing other material facts from Plaintiffs and the Class Members, Defendants breached its duties to disclose these facts, violated the North Carolina Unfair and Deceptive Trade Practices Act, and caused injuries to Plaintiffs and the Class Members. The omissions and acts of concealment by Defendants pertained to information that was material to Plaintiffs and the Class Members, as it would have been to all reasonable consumers.

183.    Plaintiffs, individually and on behalf of the other Class Members, request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the other Class Members any money Defendants acquired by unfair competition, including actual and treble damages, and for such other relief set forth below.

**B. BREACH OF EXPRESS WARRANTIES CLAIM**

**SEVENTH CAUSE OF ACTION**

**Breach of Express Warranties**

184.    Plaintiffs Galindo, Gurtler, Perry, and Witcher incorporate by reference the foregoing allegations of this Complaint as if fully set forth herein.

185.    The engines in Class Vehicles were covered by express warranties provided by Defendants and became a basis of the bargain in purchasing or leasing those Class Vehicles.

186.    By taking their vehicles to dealerships after experiencing problems as a result of the Engine Defect or for inspection upon learning about Defendants' recalls, Plaintiffs Galindo, Gurtler, Perry, and Witcher took reasonable steps to notify Defendants of the Engine Defect within a reasonable time, enabling Defendants inspect their cars for the Engine Defect.

187.    Defendants breached these warranties by selling and leasing Class Vehicles with the Engine Defect, refusing to honor the warranties by providing replacements, and when recall repairs were made, Defendants failed to make the Class Vehicles safe to operate or be used in the manner they were intended.

188.    Plaintiffs Galindo, Gurtler, Perry, and Witcher were harmed as a result of

1  Defendants' breach because they paid substantially more for their vehicles than they are worth and

2  incurred costs related to the Engine Defect and repairs.

3       189.  The failure of Defendants to honor their warranties was a substantial factor in causing

4  Plaintiffs Galindo, Gurtler, Perry, and Witcher harm.

5       190.  Plaintiffs Galindo, Gurtler, Perry, and Witcher and the Class Members have complied

6  with all obligations under the warranties, or otherwise have been excused from performance of those

7  obligations as a result of Defendants' conduct described herein.

8      **C.  <u>BREACH OF IMPLIED WARRANTIES CLAIMS</u>**

                         **<u>EIGHTH CAUSE OF ACTION</u>**

9                      **Breach of Implied Warranty of Merchantability**

10                      **(Nev. Rev. Stat. § 104.2314)**

11       191.  Plaintiffs incorporate by reference the foregoing allegations of this Complaint as if

12  fully set forth herein.

13       192.  Plaintiffs bring this cause of action against Defendants on behalf of themselves and

14  on behalf of the members of the Nationwide Class, or, in the alternative, Plaintiff Galindo brings

15  this claim on behalf of the Nevada Class.

16       193.  Defendants each constitute a "merchant" and manufacturer of Class Vehicles.

17       194.  Plaintiffs and members of the Class are "buyers" of Class Vehicles in privity with

18  Defendants.

19       195.  Defendants impliedly warranted to Plaintiffs and Class members that its Class Vehicles

20  were "merchantable" within the common meaning of "merchantability" expressed in Nev. Rev. Stat.

21  § 104.2314.

22       196.  Specifically, Nev. Rev. Stat. § 104.2314 requires that merchantable goods:

23  (1) pass without objection in the trade under the contract description; and
(2) in the case of fungible goods, are of fair average quality within the description; and

24  (3) are fit for the ordinary purposes for which such goods are used; and
(4) run, within the variations permitted by the agreement, of even kind, quality

25  and quantity within each unit and among all units involved; and
(5) are adequately contained, packaged, and labeled as the agreement may

26  require; and
(6) conform to the promises or affirmations of fact made on the container or

27  label if any.

28       197.  Here, the implied warranty included, among other things: (i) a warranty that the Class

Vehicles and their engines would be fit for the ordinary purposes for which such goods are used; and (ii) a warranty that the Class Vehicles and their engines manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation.

198.    Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale, thereafter, were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. That is, the Class Vehicles are dangerous due to the Engine Defect.

199.    The Engine Defect is inherent in each Class Vehicle and was present in each Class Vehicle at the time of sale and thus manifested itself within any applicable warranty period.

200.    Any limitation or negation of the implied warranty is unconscionable and unenforceable. Defendants had knowledge of the Engine Defect at the time they issued any limitation or negation of the implied warranty and Plaintiffs had no notice or ability to detect the Engine Defect at the time of their purchases. As such, Defendants knew that Plaintiffs would not be able to receive the benefit of their bargain when they purchased Class Vehicles.

201.    As a direct and proximate result of Defendants' breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, Plaintiffs and Class Members were harmed and suffered actual damages.

202.    Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

## NINTH CAUSE OF ACTION

### Breach of Implied Warranty of Merchantability

**(Ariz. Rev. Stat. § 47-2314; Mich. Comp. Laws. § 440.2314; N.C. Gen. Stat. § 25-2-314)**

203.    Plaintiffs Silvera, Gurtler, and Perry incorporate by reference the foregoing allegations of this Complaint as if fully set forth herein.

204.    Plaintiffs Silvera, Gurtler, and Perry bring this cause of action against Defendants on behalf of themselves and on behalf of the members of the Nationwide Class, or, in the alternative, Plaintiff Gurtler brings this claim on behalf of the Arizona Class, Plaintiff Perry brings this claim on behalf of the Michigan Class, and Plaintiff Witcher brings this claim on behalf of the North

1   Carolina Class

2       205.    Defendants each constitute a "merchant" and manufacturer of Class Vehicles.

3       206.    Plaintiffs Silvera, Gurtler, and Perry and members of the Class are "buyers" of Class

4   Vehicles in privity with Defendants.

5       207.    Defendants impliedly warranted to Plaintiffs and Class members that its Class Vehicles

6   were "merchantable" within the common meaning of "merchantability" Ariz. Rev. Stat. § 47-2314,

7   Mich. Comp. Laws. § 440.2314, and N.C. Gen. Stat. § 25-2-314.

8       208.    Specifically, Ariz. Rev. Stat. § 47-2314, Mich. Comp. Laws. § 440.2314, N.C. Gen. Stat.

9   § 25-2-314 require that merchantable goods:

10  (1) pass without objection in the trade under the contract description; and
    (2) in the case of fungible goods, are of fair average quality within the description; and

11  (3) are fit for the ordinary purposes for which such goods are used; and
    (4) run, within the variations permitted by the agreement, of even kind, quality

12  and quantity within each unit and among all units involved; and
    (5) are adequately contained, packaged, and labeled as the agreement may

13  require; and
    (6) conform to the promises or affirmations of fact made on the container or

14  label if any.

15      209.    Here, the implied warranty included, among other things: (i) a warranty that the Class

16  Vehicles and their engines would be fit for the ordinary purposes for which such goods are used; and

17  (ii) a warranty that the Class Vehicles and their engines manufactured, supplied, distributed, and/or

18  sold by Defendants were safe and reliable for providing transportation.

19      210.    Contrary to the applicable implied warranties, the Class Vehicles and their engines

20  at the time of sale, and thereafter, were not fit for their ordinary and intended purpose of providing

21  Plaintiffs Silvera, Gurtler, and Perry and Class Members with reliable, durable, and safe

22  transportation. That is, the Class Vehicles are dangerous due to the Engine Defect.

23      211.    The Engine Defect is inherent in each Class Vehicle and was present in each Class

24  Vehicle at the time of sale and thus manifested itself within any applicable warranty period.

25      212.    Any limitation or negation of the implied warranty is unconscionable and

26  unenforceable. Defendants had knowledge of the Engine Defect at the time they issued any limitation

27  or negation of the implied warranty and Plaintiffs Silvera, Gurtler, and Perry had no notice or ability

28  to detect the Engine Defect at the time of their purchases. As such, Defendants knew that Plaintiffs

Silvera, Gurtler, and Perry would not be able to receive the benefit of their bargain when they purchased Class Vehicles.

213.    As a direct and proximate result of Defendants' breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, Plaintiffs Silvera, Gurtler, and Perry and Class Members were harmed and suffered actual damages.

214.    Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

**TENTH CAUSE OF ACTION**

**Violation of the Song-Berverly Consumer Warranty Act for Breach of Implied Warranties (Cal. Civ. Code §§ 1791.1 & 1792)**

215.    Plaintiffs incorporate by reference the foregoing allegations of this Complaint as if fully set forth herein.

216.    Plaintiffs bring this cause of action against Defendants on behalf of themselves and on behalf of the members of the Nationwide Class, or, in the alternative, Plaintiffs Silvera, Esqueda, and Rexroad bring this claim on behalf of the California Class.

217.    Class Vehicles are a "consumer good" within the meaning of Cal. Civ. Code § 1791(a).

218.    Plaintiffs and members of the Class are "buyers" within the meaning of Cal. Civ. Code § 1791(b) in privity with Defendants.

219.    Defendants each constitute a "manufacturer" of the Class Vehicles within the meaning Cal. Civ. Code § 1791(j).

220.    Defendants were at all relevant times the manufacturer of the Class Vehicles within the meaning Cal. Civ. Code § 1791(j). Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

221.    By operation of law, Defendants provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

222.    Cal. Civ. Code § 1791.1(a) states:

"Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:
(1) Pass without objection in the trade under the contract description;
(2) Are fit for the ordinary purposes for which such goods are used;
(3) Are adequately contained, packaged, and labeled; and
(4) Conform to the promises or affirmations of fact made on the container or label.

223.    Here, the implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their engines would be fit for the ordinary purposes for which such goods are used.

224.    Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. That is, the Class Vehicles are dangerous due to the Engine Defect.

225.    The Engine Defect is inherent in each Class Vehicle and was present in each Class Vehicle at the time of sale and thus manifested itself within any applicable warranty period.

226.    As a direct and proximate result of Defendants' breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Engine Defect, Plaintiffs and Class Members were harmed and suffered actual damages.

227.    Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

## ELEVENTH CAUSE OF ACTION

### Breach of Implied Warranty Under the Magnuson-Moss Warranty Act
### (15 U.S.C. § 2303 *et seq.*)

228.    Plaintiffs incorporate by reference the foregoing allegations of this Complaint as if fully set forth herein.

229.    Plaintiffs bring this cause of action on behalf of themselves and on behalf of the Nationwide Class.

230.    The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

231.    Plaintiffs and Nationwide Class Members are "consumers" within the meaning of the Magnuson- Moss Warranty Act, 15 U.S.C. § 2301(3).

232.    Defendants are each a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

233.    Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their engines manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use while being operated.

234.    Contrary to the applicable implied warranties, due to the Engine Defect, the Class Vehicles were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation.

235.    Defendants' breach of its implied warranties has deprived Plaintiffs and Class Members of the benefit of their bargain.

236.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25,000. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

237.    Defendants have been afforded a reasonable opportunity to cure its breach, including when Plaintiffs and Class Members brought their vehicles in for diagnoses and repair of the engines.

238.    As a direct and proximate cause of Defendants' breach of implied warranties, Plaintiffs and Class Members sustained damages and other losses in an amount to be determined at trial. Defendants' conduct damaged Plaintiffs and Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

239.    As a result of Defendants' violations of the Magnuson-Moss Warranty Act as alleged herein, Plaintiffs and Class Members have incurred damages.

## **RELIEF REQUESTED**

240.    Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to

enter judgment against Defendants, as follows:

    (a)    An order certifying the proposed Class, designating Plaintiffs as named representative of the Classes, and designating the undersigned as Class Counsel;

    (b)    A declaration that Defendants are financially responsible for notifying all Class Members about the defective nature of the Class Vehicles' engines;

    (c)    An order enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling Defendants to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling Defendants to remove, repair, and/or replace the Class Vehicles' defective engines with suitable alternative product(s) that do not contain the defects alleged herein; enjoining Defendants from selling the Class Vehicles without disclosing the Engine Defect; and/or compelling Defendants to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed;

    (d)    An award to Plaintiffs and the Class for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

    (e)    Any and all remedies provided pursuant to the Magnuson- Moss Warranty Act;

    (f)    Any and all available equitable relief, including but not limited to restitution.

    (g)    A declaration that Defendants must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or lease of its Class Vehicles, or make full restitution to Plaintiffs and Class Members;

    (h)    An award of attorneys' fees and costs, as allowed by law;

    (i)    An award of pre-judgment and post-judgment interest, as provided by law;

    (j)    Leave to amend the Complaint to conform to the evidence produced at trial; and

    (k)    Such other relief as may be appropriate under the circumstances.

## **JURY DEMAND**

Plaintiffs hereby demand a jury trial in the instant action.

//

//

Dated:  March 20, 2019

Respectfully submitted,

*/s/ Hassan A. Zavareei*
Hassan A. Zavareei (State Bar No. 181547)
**TYCKO & ZAVAREEI LLP**
1828 L Street, N.W., Suite 1000
Washington, D.C. 20036
Telephone: (202) 973-0900
Facsimile: (202) 973-0950
E-Mail: hzavareei@tzlegal.com

Annick M. Persinger (State Bar No. 272996)
Tanya S. Koshy (State Bar No. 277095)
**TYCKO & ZAVAREEI LLP**
The Tower Building
1970 Broadway – Suite 1070
Oakland, CA 94612
Telephone: (510) 254-6808
Facsimile: (510) 210-0571
E-Mail: apersinger@tzlegal.com
E-Mail: tkoshy@tzlegal.com

Jonathan Streisfeld (to seek admission Pro Hac Vice)
Daniel Tropin (to seek admission Pro Hac Vice)
**KOPELOWITZ OSTROW**
**FERGUSON WEISELBERG**
**GILBERT**
One West Las Olas Blvd., Ste. 500
Fort Lauderdale, FL 33301
Telephone: (954) 525-4100
Facsimile: (954) 525-4300
E-Mail: streisfeld@kolawyers.com
E-Mail: tropin@kolawyers.com

Jeffrey Kaliel (to seek admission Pro Hac Vice)
Sophia Gold (to seek admission Pro Hac Vice)
**KALIEL PLLC**
1875 Connecticut Avenue NW, 10th Floor
Washington, DC 20009
Telephone: (202) 350-4783
E-Mail: jkaliel@kalielpllc.com
E-Mail: sgold@kalielpllc.com

E.  Powell Miller (to seek admission Pro Hac Vice)
Sharon Almonrode (to seek admission Pro Hac Vice)

**THE MILLER LAW FIRM, P.C.**
950 West University Drive
Rochester, MI 48307
Telephone:  (248) 841-2200
Facsimile:    (248) 652-2852
E-Mail: epm@millerlawpc.com
E-Mail: ssa@millerlawpc.com